Good afternoon, and may it please the court. Bronson McClelland was punished for speech far outside of school that, albeit offensive, we don't dispute that, was protected by the First Amendment. Nevertheless, he was punished, and then after he, and he was punished pursuant to a district-adopted policy that was authorized by the district, and the district in a public statement said, yes, he's being punished pursuant, or in accordance with this policy, the KISD Athletic Code of Conduct, he was disciplined from the football team and lost his captaincy. But that wasn't enough for the district and its officials. After Bronson, on his own, made a public apology, a lengthy, sincere apology, it's in the record, the district official came and said, that's not good enough. We want you to change what you said. We disagree that you were only suspended for two games. You need to tell people you were suspended indefinitely, and we got off half-cocked. We know the facts, and my question to you is going to be, the courts haven't helped you out much, right? That's true. We in the Supreme Court, we just keep saying we're going to leave this for another day. Whether off-campus, disruptive, certainly threatening speech, is something that school officials can discipline for. But if you agree that we, the Fifth Circuit, and even the Supreme Court just last year, have been unwilling to say what the law is, how is it that they wouldn't get qualified immunity? So, Your Honor, on qualified immunity, on appeal, we're only arguing qualified immunity as to a single defendant at this point, and that's Hull, the principal. And there, the argument we're making on appeal is that the issue wasn't the original, we're not saying he may or may not have qualified immunity for the original punishment, the two games, suspension and the loss of captaincy. Because, as this court said in Longoria issued a couple months after this, there's a lot of uncertainty on that. But, the law is settled that a government official cannot compel speech. Here, Hull ordered McClellan to change his public apology. McClellan refused and stood by his statement. Okay, so your case entirely rests on the fact that they I guess, what's your First Amendment case against Hull? Against Hull? Yeah. It's compelled speech and retaliation. Retaliation assumes there's protected speech. I agree. Where's the clearly established law saying a threat, put aside the racial epithet, just a threat of violence to another is protected speech. Okay, that gets to the question of was the Longoria, this court says non-threatening speech, even if offensive. I know, but I'm just focusing on the threat here. And here, what I would say is that 12B6, you can't decide threat just by looking at the statement. If I go up to somebody and say, I'm going to beat the hell out of you. The context matters. If I'm in a bar with a broken beer bottle, that's a threat. If I say it to my friend as we're walking up to the first tee box at the golf course, not a threat. But district courts do decide at the motion to dismiss at this stage, in criminal cases, whether it's a threat or not. They'll dismiss it if they don't think the reasonable listener could construe it to be a threat of bodily harm. Well, it may be true in the criminal context. What we see in the civil cases, however, is that courts don't do this at the 12B6 because of the factually intensive inquiry that courts look at. And I would call the court's attention to the Mannheim case discussed in our reply brief and also one of the cases cited by the district in its most recent 28J letter, the Hedgwick v. Western Michigan case. There's the dispute of fact, if you say I'm going to put the UMF in the hospital, how could that not be a threat? Very simple. Because under the test for whether or not it's a unprotected threat, the first question is, what was the threat? Were they taunting each other? Sure. But it wasn't an actual threat of violence. There was no subjective intent. The recipient of the video, because remember, the video is only sent to one person, and that's Mr. Hernandez. Nothing suggests he thought it was a threat. The school and its officials never acted like it was a threat. Texas Education Code, as we set forth in our brief, has this lengthy process you have to go through if you think a student has made a threat of violence. None of that occurred here. And he was back in school the next day. If they really thought this guy was threatening violence, would they really just let him back into school the next day? Of course not. There's a factual context, which is why in all the cases cited in the briefing we see, with one exception, these are all being cited summary judgment when there's a full factual record. You see the Hedgwick case that recently came down. There, you've got a person makes a video pointing a gun at the camera saying, you're done, you're done, you're done, bud. Sends it to a girl, a fellow student, who says, he's my stalker. Even there the court was unwilling at 12B6 to say it was a threat unprotected by the First Amendment. And the reason for that is you always have to look at the factual context in which the statement is made. What about the claim that you waived your compelled speech and retaliation by claims by failing to address them in your response to the motion to dismiss? You know, a couple of thoughts on that. First, you always have to look at the response in the context of the motion to dismiss that was filed. In the motion to dismiss, compelled speech and retaliation come up in a sentence or two, at the most. And we cite the pages in our record. In our response, at the beginning of the response, we lay out the facts of the case as alleged that Bronson was retaliated against because of his failure to go along with the compelled speech that was asked of him to change the public apology he made. And we find that at both 713 and 714 in the record, which are cited in our brief, and two additional pages later in the response that I failed to cite in the reply brief, 737 and 738, which are at the end of that response, which also address this issue of the retaliatory, pretextual search for marijuana, where he was punished based on the presence of a single peppercorn-sized piece of marijuana, which he was later cleared of, that we allege was retaliatory for his standing on his First Amendment rights previously. So that's my response to their contention that it was not properly preserved in the trial court. So the district court then dismissed all claims, right? Granted the motion to dismiss. That's correct. And the plaintiff filed a motion to reconsider. That's correct. Didn't deal with these claims. With the retaliation claims? With the compelled speech and retaliation. In other words, to the extent that it may or may not have been preserved in the motion to dismiss litigation when the district court dismissed everything, was it or was it not brought up in the motion to reconsider? I don't believe it was, Your Honor. My recollection is the motion for reconsideration focused pretty much specifically on the reasoning present in the district court's order. But be that as it may, it's there. And those rights are well established. And Judge Higginson, to your question earlier, in the context of qualified immunity, whether something is compelled speech, whether something is retaliation, I believe those are well-established rights. If you're saying, well, do we have to show that it's clearly established that the speech, that the prior speech was protected or not, I don't think it's actually relevant here. Because the compelled speech was not, whether or not the three seconds video was protected speech or not, we say it was. But even if it, whatever it was, the compelled speech is tied to Bronson's apology and a school official demanding that he change his apology. Whatever the status of the three seconds is, no one seriously disputes that his apology was protected for speech. But setting aside the qualified immunity issue, we also have Monell. Just remind me the timeline of discipline. He's suspended for the speech. Then they try to apologize quickly. Your client does. Correct. The district court's dissatisfied. I'm sorry. The school officials and coach are dissatisfied. Is the punishment of him then enhanced? No. So, okay. So the punishment, the two-game suspension and the loss of capacity, that was before the apology. That wasn't changed at that time. So where is there any address? Sure. The subsequent contextual marijuana search later was in retaliation for his failure to engage in the compelled speech that he refused to engage in. Okay. The discipline you claim that was for marijuana being in his car, you say is actually because he wouldn't apologize, correct? Correct. And for his search of his First Amendment rights. That's right. Now, but even with the original punishment, the district has Monell liability. And here we allege that he was punished. And to be clear, the district in an official communication from its own district email account says this, that he was punished in accordance with the KISD athletic code of conduct. The KISD handbook is in the record. It says KISD in big letters right on the cover. And then at page 599 of the record it says, if you want to see the entire KDISD athletic code of conduct, you can find it on the KDISD athletic website. And we also have the email where KDISD itself acknowledges this is our policy and that he was punished in accordance with it. So even as to that original punishment, the two games and the loss of the cap and see, we have Monell liability there. And whether it was clearly established or not doesn't matter because as this court made clear in Grodin, if you have a policy made by the policymaker and that policy is approved and adopted by the relevant official or whoever the policymaker is, you're there as long as you then allege that the punishment was authorized by that policy. That's precisely what we have here. What's the specific policy? So the policy covers a few different things. And in particular, the parts of the policy we're complaining about are the parts of the policy that both regulate the off-campus, non-school speech of students, student-athletes, and the fact that that policy also gives school officials the right to discipline athletes who violate that code of conduct. We point to three specific aspects of the code of conduct. First, it says that you must conduct yourself as gentlemen and ladies at all times. Second, it says you must model behaviors that are appropriate for a leader both at school and in the community. And then finally, there's a general, be a good citizen at all times. The policy on its face reaches speech and conduct that occurs outside of school hours. That's precisely what the Supreme Court most recently in Mahanoy and this court has made clear in Longoria. But all speech off-campus after hours is certainly not protected speech under those cases, right? In other words, if you're off-campus and you make a statement and it has disruptive impact in the school day or at school, if the kid's stalking a teacher, kid's spoofing a teacher on social media, I mean, there's all different cases that have bubbled up that are off-campus outside school time that have been ruled not protected. I would suggest, Your Honor, that after Mahanoy, it's actually, I mean, you're right. If there's evidence of substantial disruption, there's, in some cases, off-campus speech can be regulated. There's none of that on these pleadings or in this record. In their brief, they say, oh, there's disruption. It's not in the record. It's not in the allegations. If they want to prove that during discovery and try to move for summary judgment on that later, that's their right. But on the allegations, factual allegations pled in this case, they don't make it here. It's a Snapchat video, but it's not that different than the rap lyrics in our Bell case, right? The rap lyrics were off-campus against the coach, threatening violence on the coach. It's pretty close to that. Here, we upheld the discipline. That's certainly true, and I would make two points there. I do think there's a big distinction from Bell between a private video sent to one person who, and let's be clear, this statement didn't threaten violence against anybody in particular. It was just, he had kids yelling back and forth at each other through videos and in person. And he sends this video to one person. That is a far cry from this rap song that specifically targeted a specific person. And, in fact, when we see the cases about what constitutes protected or unprotected threats, one of the things we look at is, you know, what was the subjective intent? Was it directed at the person or made even known to the person who violence was being threatened against? Again, I go back to the Hedgewick case. Just because you've got a little time, did you want to speak about Judge Ellison's, the way he dealt with the overbreath and the vagueness? He basically said, where's the property interest, correct? Right, he did. And I appreciate that, Your Honor. You know, this court, and I'll point to most recently Plummer v. University of Houston, you know, the court said that there is a liberty interest in the higher education. Similarly, in Doe v. Silsby, this court acknowledged that, look, reputational harm alone isn't enough. But this court has time and time again said, if the reputational harm is such that it affects your ability to pursue your education, pursue your profession. He did. He transferred. He got a public education. He got to college. He didn't lose a scholarship, did he? Oh, yes, he did. He lost the possibility of one or he had one rescinded? He did not have it. He was a junior at the time. So it was nothing rescinded. He had offers and was being recruited. But I think it goes through a further interest of causation. On the facts alleged, and remember, he's the quarterback of, you know, Katie High School, the number one team in the state. We're talking John Curtis or Evangel up in Shreveport. This isn't just some random guy at some random school. He's number one at the best school in the state for football. And we allege that, but for this conduct, he goes on, gets his college scholarship, pursues his education. And we talk about, you know, also now that, you know, it's not just the scholarship anymore. With the name, image, and likeness money, there is huge money out there for football. Sorry, Adam. No, you've got rebuttal time. Appreciate it. Thank you. Let's see. Mr. Gilbert. There is only one person responsible for what happened to Bronson McClellan, and that's Bronson McClellan. May it please the court, my name is Chris Gilbert, and together with Stephanie Hamm, we represent the KDISD defendants in this matter. The facts here are actually quite straightforward. Using Snapchat, McClellan threatened another student to put your mother-effing ass in the hospital, N-word, what the F. He received a fairly minor extracurricular punishment for that. A year later, he brought marijuana to the school in his truck. He received a DAP placement that state law requires for every student who brings marijuana to school. And there are no allegations that he was treated any differently than any other student would have been treated in the same situation. Rather than face the consequences for his action, he and his parents decided to move to California so that he could play football there. To help him, the school district agreed to abate the discipline proceedings that were going on at that moment, and they entered into a settlement agreement. And in that settlement agreement, McClellan, they specifically said, quote, the student will be required to finish the assigned time in the discipline alternative campus, and, quote, the family would still be permitted to a hearing in front of a district-level committee, which would be the same hearing that was scheduled for September 29, 2020. But when they returned from California to the school district in November of 2020, the family started arguing that the DAP placement that was called for in the settlement agreement was some sort of illegal second hearing, and that it was somehow impermissible, even though that was exactly what they had agreed to do in the settlement agreement that they signed in consideration for the abatement of the disciplinary proceedings. Now, you can feel sorry for McClellan for the impact that this has had on his football career, but at the end of the day, his constitutional rights were not violated, and the only person who is at fault is him. One of his principal arguments is that this, the issue of whether it's a true threat, not protected, is something that's not decided at the motion dismiss stage. So I think that that is one of their arguments. I think that that argument confuses two different uses of the word threat. We have not argued that this is a true threat. What we have argued is that this is the threat, and numerous cases have acknowledged that. The true threat doctrine, because it arose in the criminal context and because a true threat is not subject to the First Amendment at all, imposes a very high standard. But when the school district and the district court use the word threat, what they're talking about is a general threat. And, in fact, that has been acknowledged by several of the cases. Some of the cases that they cite in their brief on page 6 of their reply, where they try to conflate true threats with regular threats, Doe v. Hoptican Public School District, A.M. v. Cash, C.R. v. Eugene, none of those cases address the true threat doctrine. But Bell v. Etiwamba County did. And, in fact, the court there specifically said, regardless of whether Bell's statements in the rap recording qualify as true threats, as discussed in Part 2B, they constitute threats, harassment, and intimidation as a lay person would understand the terms. And, in fact, the — Do you think Bell is just squarely on point? I think Bell is squarely on point in this case, absolutely. And Longoria didn't change that. It's after the fact anyway, and it says threats are distinctive. Well, Longoria didn't change it. I think Longoria is — Longoria, of course, found qualified immunity for the people that were involved. Longoria was actually an easier case because the speech at issue in that case was nonthreatening speech that really wasn't aimed at the school community. If we only had the racial epithet, and this had happened after the Supreme Court's decision last year, Mahanoi — In Mahanoi, yeah. This would seem to be this would be protected speech. It's up to parents. It's not up to schools. Do you agree with that or not? No threat. Not entirely because, again, I think it's aimed at the school community. But just profanity instead of — Just the profanity. That would be a harder case. There are cases that have held that profanity and using profanity — and I'm blanking on the name of the case. There are cases that have held that. But I think in this case, what's always been most important is the fact that it was a threat. And that's where Longoria is distinguishable. Do you agree with me that courts, including the Supreme Court, have not given much guidance to school officials or students? Courts have given no guidance. Well, the Supreme Court has given no guidance. This Court in Longoria gave some guidance, but that guidance was all for nonthreatening speech. So it's very distinguishable from this situation. So it's not helping anyone, the students or the schools. Judge Ellison seemed to appreciate there's a lot of tragedy here. I would agree with that. I think both parties in Mahanoy at the Supreme Court said to the Supreme Court, please give us guidance, please tell us what the test should be, and they didn't. They backed off and said, we're going to leave that for another day. I appreciate this dialogue, both of you. But what about his argument that the compelled speech component is independent of this line of confusion that we've got? So I'm a little surprised to hear that the video is not important anymore because that's what the case was about at the lower level. First of all, we do believe that they waived and abandoned any compelled speech or retaliation claim by not briefing it. And they didn't brief it. He talks about that. He says he raised it in response to the motion to dismiss. They did not brief it three times. It is not in the response to the motion to dismiss. It is not in their supplemental reply to the qualified immunity brief. And most importantly, it's not in their motion for reconsideration. I don't think they raised it. And what's really important is – If it was raised in response to the motion to dismiss, would that be enough to preserve it? If they had raised it, yes, I think it would be. But they didn't. But what exactly – when you say most importantly, I'm – Oh, the motion – Well, I say that because just because someone moves to dismiss and they don't mention something, it wouldn't necessarily occur to me that you've got to sort of re-preserve it. Then the district court, as Judge Wilson said, did dismiss all, and then the motion to reconsider it didn't bring up. Is that correct? Correct. I think what would have happened is, in this case, if they had truly been pursuing a compelled speech or retaliation claim, when we filed the motion to dismiss, which said please dismiss the entire claim, they would have said, hey, Judge, they didn't address this claim in their response to our motion to dismiss. They did not say that. Because in your motion to dismiss, you never used the phrase compelled speech, do you? I think it's mentioned in one – it's mentioned in one sentence. But it was not a big part because I don't think anybody realized that that was what the basis for their claim was. We were talking about whether Mahanoy in particular – So then they don't respond. They don't really see it as their view. Right. The judge dismisses the whole thing, and then in a motion for reconsideration, that's where you would expect them to say, wait a minute, Your Honor, we had this whole other theory that you didn't address, and that was the basis for our claim. They did not address that. And what's your best case that that creates a forfeiture? Failure to bring it up in a motion to reconsider. You may have put it in the brief just now. It's Black v. North Panola School District, failure to – plaintiff abandons a claim by failing to defend it in response to the motion to dismiss. It's in our brief. Okay. Keep going. So I do think that they abandon those claims. But more importantly, if you look at the merits of those claims, they have never offered a – so their argument – and again, it shifts a little bit. Their argument originally was – and the timeline is important here because he had already been punished. They had already taken away his captaincy and suspended him for two games based on the video when this alleged compelled speech claim arose. That's when supposedly the school district wasn't happy with his apology and they went to him and they said, hey, can you change that? And they wouldn't change it. And as counsel admitted, they did not change the punishment at that point. Their argument has been up until now that the punishment was the press release that the school district put out, that they put out a press release that defamed him by somehow accusing him of being a racist. And that was the press release that the school district put out after they wouldn't change it. Now, I would point out if you read the press release, and it's paragraph 20 of the Second Amendment complaint, it specifically says a student posted a video of himself on social media in which he used racially charged language to taunt a student athlete on the opposing team. There's nothing incorrect about that. But that was put out – Was the student athlete on an opposing team? That may be the one point where there's a little bit of variance because it was somebody at the other school. I don't think that ultimately – what? I was going to ask the same question because I think the recipient originally was not an athlete. It was not on the football team. The recipient – at the time they were arguing about this when the press release came out and they admit this in the complaint, they didn't know – nobody knew who the recipient was because they gave the school district a wrong name and they were trying to figure out. It was only the following week that they finally said, hey, this is who it is. And by that point, all these press releases had already been released and everybody had already talked about it. So I think at the time the school district made that statement, I do think they thought that's what it was. But I don't think ultimately that whether the person was actually on the opposing team, he was a student at the opposing school and obviously the statement was made in connection with this heated football game where they all then went to the Whataburger to apparently taunt each other and that's when the video was released. But the case I would point you to, they've never really given you any case law that says this kind of thing would be a compelled speech. And I would direct the Court's attention to Siemens v. Snow, which is a Tenth Circuit case. Siemens has this exact same claim in it. In that case, there was a horrific set of facts in that case. It was a student who was sexually assaulted in the locker room and then after he reported his sexual assault to the school, the coach allegedly, according to the allegations, dragged him in front of the team and made him apologize to the team for costing them the ability to go forward. But in that case, the school district went to the parents and said, hey, we don't think that's really what happened. We want you to change what you're saying to the press. Parents said no. And the school put its own portion out. And that was the basis for the First Amendment claim. That's exactly what they're alleging here. And the Court there said, the defendants issued their statements pursuant to their own First Amendment rights and explained that the essence of the First Amendment is to allow all parties the opportunity for attempts to persuade as well as the opportunity for robust, even hostile exchanges of conflicting views. And the Court rejected the First Amendment claim of the parents there, which is the exact same compelled speech claim that they're making here. I also don't think you get to retaliation on the merits because the alleged discipline that they argued here was the DAEP placement. That's a year and a month later, and it's after they admit that the drug dog alerted on the car, and they admit that a substance of the district determined to be marijuana was found in the car. So I think that breaks any chain of causation between arguing that it was somehow his failure to change his apology a year and a month earlier that led to this. I don't think that plausibly sets out a retaliation claim. I would go back, and just to go back and pick up the First Amendment claim a little bit, the video, and talk a little bit about Mahanoy. We submitted a letter last week to the Court, a supplemental authority letter, pointing out some new cases that have been decided applying Mahanoy, and there aren't many of them. There's just a handful of district court cases and one circuit court case. But I think it's important when you look at those cases, those cases all distinguish between speech that is about an issue and speech that threatens or targets another student. So if you look at C1G, which is the one circuit court case from the Tenth Circuit that really addresses that, this was the case where some students dressed up, they were at a thrift shop, either after school or on the weekend, they dress up in military uniforms, they take pictures, and they put something out there saying, me and the boys about to exterminate some Jews. And the school district punished them for that. The Tenth Circuit ruled in favor of the students, but only by distinguishing the fact that that speech was not targeted at the school community, it wasn't aimed at anybody specifically, and it was not a threat. And they pled there that it was a joke. And that's an important factor. I'll skip one of my cases and talk about Hedrick, which they mentioned several times. This is a new case involving the Western District University. That was this student who had a crush on a girl, and he sent her a video in which he — it was a creepy video, he was pointing the gun, and it was arguably a threat, but not an explicit threat. Now, what's interesting about that court, that case, is they denied the motion to dismiss, and I concede that. Because they had pled that it was a joke. Same thing in C1G. They pled that it was a joke. I thought he pled this was a taunt. He did plead that it was a taunt. He did not plead that it was a joke. And I think there's a big difference. I think there's a difference. And obviously we don't see any case law distinguishing between taunts and threats. But he didn't plead that it was a joke. And the video is in the record. Have any of you saw the differentiation between jokes and taunts? I think a joke and a taunt is different. I think a taunt is more — a taunt is directed to try to get a reaction out of the other person. And that's what this video arguably was. I mean, because, again, you have to look at the context. You're sitting in the SEC, and, frankly, I think there's taunts all the time between one football team and another football team, one set of football fans, another set of football fans. I don't really perceive any of those things as threats. And I don't — Where's your authority that there's a distinction between jokes and taunts? I don't know of any authority that would specifically address that issue. I would be careful than differentiating between the two or equating the two. I think a joke is something that's more in the abstract. Hey, hey, we're going to go — and that's a horrible joke. But in C1G it was the we're going to exterminate some Jews. That's not aimed at anybody. A taunt or a threat is aimed at somebody and is desiring to get a reaction out of them. And the context here is that they went to the Whataburger to taunt the other team. So this is not only speech. It's speech mixed with action. Because it wasn't just sort of a ha-ha joke in the abstract. It was intended, it certainly seems, and the video is in the record. It's not a joking manner in which the statement is said. Do they know each other? Is that in the record? I don't believe the record — I mean, they were on a — I don't know that the record really establishes that. Were they friends? I don't think the record — I don't think they're friends, no. They had each other's snaps, right? Bronson McClellan used another student's phone and sent the Snapchat. And I have to be honest, Your Honor, I don't know whether you would have to be a friend. And it may be that he used the other person's phone because that had a direct link. I think that goes to show that this wasn't really private speech if you were using somebody else's phone to send this. But I don't think the record establishes that they were friends having a joking relationship. But what's interesting about Hedrick is, after dismissing the motion to dismiss — and they denied the motion to dismiss solely because they had pled that it was a joke — they then turned to the issue of the request for a temporary injunction. And they denied the plaintiff's temporary injunction, and the court specifically found that the student cannot make a strong or substantial showing of likelihood of success under Tinker because the video constituted a threat. And they looked at the context, and the court said specifically, context is important when distinguishing a genuine threat from a joke, and when assessing the foreseeable impact of such speech. And so in that case, yes, they denied the motion to dismiss because it had been pled very simply, this is a joke. But when they turned to the issue of the injunction, obviously they could look at more evidence. The evidence was it wasn't a joke because they looked at the context in which this statement was made. Here, we don't have a pleading that it was a joke, and the context is in the amended complaint. This was a heated rivalry game, and the team went to this Whataburger to taunt the other team. So I think the context shows this was not a joke and that it was intended to be a threat. Are you going to save a little time for Monell or the overbreath? I can talk about both of those right now. So Monell, I don't think they have pled a policy. I don't think you get to Monell simply by saying, hey, look, it said KDISD on this. It needs to be something that actually has been adopted by the school board to be an actual policy. They embraced it when they sent out the press release, didn't they? With the school district? I thought they cited the Code of Athletic Conduct as what he violated. They did, but number one, that still doesn't go to show that it was adopted by the board. And, in fact, importantly in this distinct Had it been adopted by the board or if the board delegated that to the athletic director or whomever was in charge? You would have to have, yes, you can delegate policymaking authority, but you would have to have pretty solid evidence or facts alleged of that, and there are very few cases that have found a delegation like that, and I don't think they've alleged the facts here. So your position is that the press release that goes out calling it the KDISD Code of Athletic Conduct wouldn't have been some sort of evidence at least to suggest that it was policy of the board? No. I don't think it is. I think if you – I would compare this to Longoria again. Longoria had the same issue. There they were alleging it wasn't an athletic code of conduct, it was a cheerleader constitution. And they alleged, hey, this cheerleader constitution has the sort of blessing of the school district, and the court said you can't point to any specific evidence that the board adopted the cheerleader constitution. And the athletic code – there's no allegation in this case that the board adopted the athletic code of conduct. The student code of conduct there is, but they don't point to anything about the student code of conduct that they claim is facially unconstitutional. And under Monell, in City of Houston v. Perowski, the court said a facially innocuous policy will only support liability if it was promulgated with deliberate indifference to the known or obvious consequences of constitutional violations. And you don't have any facts that would support that very high standard for Monell liability when you're looking at a facially constitutional policy. But it's got to be the motivating factor behind the constitutional violation too, right? Correct. And that sort of takes us back to how clearly established is the law or the right that's alleged to have been violated. That's correct. And then – I've got 53 seconds. For the overbreadth and vagueness, again, I would point to – if you go back and you look at cases, the Supreme Court in Frazier and this court in Murray v. West Baton Rouge Parish School said that school districts had a much greater ability to adopt discipline rules because of the needed flexibility. In Kuczynski v. Freeland Community School District, which is one of the cases that we cited in our letter last week, they found that a provision of the student handbook that prohibited gross behavior was not overbroad or unduly vague. And then again, I would point to this court's decision in Longoria. The cheerleader constitution had a provision that said that cheerleaders were to maintain appropriate conduct. This court found that that was not overly broad in large part because you don't have a protected property right engaging in extracurricular activities, which would also be true here. I think, as Judge Ellison said, sympathy for a young man's plate does not license any court to counterman well-established law or offload ultimate responsibility from the individual to the educational authorities. For that reason, we would ask that the court uphold the decision below. Your final argument? First, I want to respond to this point that we somehow had to say the only way it's not a threat is if it's a joke, as if there's nothing in between those two poles. In Longoria, this court said harassing an offensive speech that is non-threatening is still protected. And here, the actual record shows, and this is at page 531 in the second amended complaint, particularly paragraph 14, what the allegations were were these kids from these two different schools went to the Whataburger. The kids from the other school, Tompkins High School, were taunting friends of Bronson's. And Bronson and several of his friends then went to the Whataburger as well. It was after he went to the Whataburger, he sent this one three-second video to Mr. Hernandez. And we heard Counsel for Applies saying, oh, my gosh, when we had no idea who it was, the confusion was is they thought it was Fernandez and not Hernandez. I mean, it's not like there was some great mystery who he sent the video to. They couldn't figure out if it was an H or an F. And when we get to Bell, we've heard both Counsel for Applies and this court bring Bell up. I'd point out Bell was a summary judgment case. It was working with a full factual record of the full context of the video, of the intent of the maker of the video, how it was heard by the people who viewed the video. We have none of that here. And the cases we cite, and also the Tenth Circuit and Siegfried, there they said yes because it's a joke. But if you look at the analysis of the Tenth Circuit and Siegfried, it goes at length about how at the 12B6 stage, you can't really determine this one way or the other because it's such a factually intensive issue. And it's not that jokes are okay, everything else is fair game for discipline outside of school. That's entirely contrary to Mahanoy. Mahanoy makes clear that outside of school time, there's very little interest that the school has in disciplining unless there's a threat or something where they're showing a substantial disruption. You're talking about the 2021 case last year. I am. But we're looking at what the school district would have known in October of 2017. So 2019, Your Honor. 2019. Well, we're looking at the district, but for Monell. Right. I mean, the Supreme Court cleared up a fair bit. I agree they cleared stuff up in 2021, but this isn't qualified immunity. Monell doesn't require this clearly established aspect. If the policy is unconstitutional, it's unconstitutional. And here we allege, and this is the same as in Grodin versus City of Dallas. There, as the spokesperson for the City of Dallas came out and said, we're going to have a crackdown policy on vendors in Daily Plaza. And there the court said, that's sufficient at the 12B6 stage to show a policy of the district because the official spokesperson of the city, who was the policymaker, came out and said it. And the court then said, that combined with allegations that the policy announced by the spokesperson authorized the punishment of the individual whose terms were later dismissed, that is sufficient to survive 12B6 on a Monell claim. So, yes, I agree. Mahanoy has decided later, but it doesn't affect the Monell issue because the policy was adopted by the board. And I want to briefly say this idea that we don't know who adopted the policy. The question at 12B6, again, I go to Grodin, it's just are there facts from which it's plausible that it was. Here it says right on the cover, KDISD. When you read through the policy, this is all district-level policy. It's general. It says call district office, call this district official. It is certainly facts from which a reasonable fact finder could determine this was adopted by the policy. The policy even says, if you want to see the whole thing, go look at our official website. That's enough. If they want to come back and say that somebody who had no authority on behalf of the district did this. Where's your case to support that? Grodin. Grodin v. City of Dallas. And then that combined with the press release that came from KISD itself, from their official communications department, where they call it the KISD, Athletic Code of Conduct, and sign it KISD. Again, these are all facts that are sufficient to get past 12B6. And we think that it will very quickly, in discovery, show that, in fact, it was adopted. I want to briefly suggest that this compelled speech claim was somehow surprising. It is expressly alleged at page 533 in the record, paragraphs 23 and 24 of the second amended complaint, and 542 and 543 of the record, specifically paragraphs 63 through 65. And there it's clear that what the compelled speech was, or the attempted compelled speech was, was ordering Bronson to modify his apology, which he refused to do. For these reasons, the reason to stay in our brief, we'd ask that the Court reverse or vacate, and remain for further proceedings. Thank you, Counsel.